UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELEE MARIE KROHN,

    Plaintiff,                                  Civil Action No. 12-13535

v.                                             HON. SEAN F. COX
                                              U.S. District Judge
                                              HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL            U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on December 22, 2008, alleging disability as of January 23, 2008 (Tr. 119, 126). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on November 1, 2010 before Administrative Law Judge ("ALJ") Lantz McClain in Tulsa, Oklahoma (Tr. 39). Plaintiff, represented by attorney Karlan Bender, testified by video conference (Tr. 44-55). Vocational Expert ("VE") Lisa Cox also testified (Tr. 55-57). On December 13, 2010, ALJ McClain found Plaintiff not

disabled (Tr. 33).  On June 7, 2012, the Appeals Council denied review (Tr. 1-6).  Plaintiff filed for judicial review of the final decision on August 10, 2012.

## BACKGROUND FACTS

Plaintiff, born March 3, 1971, was 39 when the ALJ issued his decision (Tr. 33, 119). She completed high school (Tr. 164) and worked previously as a bookkeeper, automotive salesperson, clerk, deli supervisor, and office worker (Tr. 159).  Her application for benefits alleges disability as a result of bipolar disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, a panic disorder, agoraphobia, asthma, and an Obsessive Compulsive Disorder ("OCD") (Tr. 158).

### A.     Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by requesting that the alleged onset of disability date be amended to November 30, 2008* (Tr. 42)*.*

Plaintiff offered the following testimony:

She did not work after November 30, 2008 (Tr. 44).  She currently lived in a single family home with her father and 10-year-old son  (Tr. 44).  She had an older son who was attending college (Tr. 44).  Her inability to leave her house due to agoraphobia and OCD resulted in her termination from three separate automotive dealerships in 2008 (Tr. 45).  For the past two years, she left her house only for doctor's appointments (Tr. 45).  She did not perform household chores or grocery shopping (Tr. 46).  Due to bipolar disorder, she was unable to concentrate on a television show for more than six minutes (Tr. 46).  She also experienced memory problems and was unable to read for more than four minutes (Tr. 47). She was unwilling to touch mail coming into the house (Tr. 47).  She was currently receiving treatment for bulimia, noting that she "binge[d] and purged" four times a day (Tr. 48). Agoraphobia and anxiety prevented her from attending her son's school events (Tr. 49).

She also experienced sleep disturbances (Tr. 49). Medication prescribed for sleep problems was ineffective (Tr. 49). Currently prescribed psychotropic medication created the side effects of stuttering, anorexia, bulimia, and liver damage (Tr. 51). She was unable to perform any of her past relevant work due to exhaustion, her inability to be around others, and symptoms of OCD (Tr. 51-53). She was unable to perform any full-time work except to "be a mom" (Tr. 52). She experienced right rotator cuff problems but had been advised against surgery (Tr. 53). She was unable to perform any lifting with the left arm (Tr. 54).

### B.  Medical Evidence[1]

#### 1.  Treating Sources

In August, 2006, Herrick Medical Center treating notes state that Plaintiff requested psychiatric inpatient treatment after experiencing increasing symptoms of anxiety (Tr. 232-233). An intake evaluation noted only "mild" psychological symptoms (Tr. 293). She signed out the following day, stating that she could not afford inpatient treatment (Tr. 232, 307). Discharge records by Harpreet S. Duggal, M.D. found the absence of anxiety or suicidal ideation but noted a history of bipolar disorder and OCD with panic disorder (Tr. 232-233). He assigned Plaintiff a GAF of 55[2] (Tr. 233, 305, 521).

October, 2006 therapy records state that Plaintiff was depressed but appeared fully alert with an intact memory (Tr. 241). December, 2006 records, noting that Plaintiff

---

[1] Records significantly predating the amended onset of disability date of November 30, 2008 are included for background purposes only.

[2] A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*")(4th ed.2000).

experienced an improved mood, state a GAF of 65[3] (Tr. 243-244). January, 2007 records note hyperactivity and "fair" judgment (Tr. 245). She was assigned a GAF of 50[4] (Tr. 246). December, 2007 therapy records state that Plaintiff reported increasing depression as a result of the upcoming holidays and legal problems resulting from writing a bad check (Tr. 257).

In January, 2008, Plaintiff reported left shoulder pain (Tr. 262). The following month, Dr. Gupta found that Plaintiff should be released from work for one month due to stress (Tr. 312 (Tr. 312, 366). March, 2008 imaging studies of the right wrist, taken after Plaintiff sustained injuries riding a mechanical bull, were unremarkable (Tr. 321, 337, 413, 519). The same month, a physician's assistant ("PA") employed by P. Lamont Okey, M.D. noted that symptoms of bipolar were worsening (Tr. 317). The following month, Dr. Okey withdrew from his treatment of Plaintiff after she allegedly accused his staff of verbally abusing her (Tr. 313). Therapy notes from the following month state that Plaintiff was depressed with intact memory (Tr. 359).

In July, 2008, Plaintiff sought emergency treatment for knee pain (Tr. 331, 419, 506). She appeared fully oriented with normal affect, insight, and concentration (Tr. 334, 420, 507). Therapy notes from the same month state that Plaintiff experienced the "multiple stressors" of unemployment, children, and finances (Tr. 355). In September, 2008, John R. Gosling, M.D. noted that surgical intervention for a rotator cuff tear was "not advised" (Tr. 346). December, 2008 therapy notes state that Plaintiff recently lost her job and had not left her house in three weeks (Tr. 372).

---

[3]GAF scores in the range of 61–70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *DSM-IV-TR* at 32.

[4]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM-IV-TR* at 34.

March, 2009 treating notes state that Plaintiff had recently begun to experience mood swings (Tr. 367). Psychological records from the same month state that Plaintiff, accompanied by her fiancé and son, was unable to complete a psychosocial assessment (Tr. 448). The therapist noted that Plaintiff experienced "opioid dependence related to chronic pain management" (Tr. 448). Plaintiff reported that she was currently living in a house that she and her fiancé built (Tr. 441). She was assigned a GAF of 45 (Tr. 445). August, 2009 treating notes state that Plaintiff's psychological condition was improving (Tr. 434). Emergency room notes from the same month state that Plaintiff sustained a rotator cuff injury while performing lifting (Tr. 498-500). She appeared fully oriented with normal concentration and memory (Tr. 498).

The following month, family physician John J. Kelly, M.D. examined Plaintiff, noting her report that she was having a panic attack (Tr. 465-466). She reported bulimia and that she refused to take Seroquel as prescribed by psychiatrist Dr. Khan due to fears of weight gain (Tr. 466). In March, 2010, Plaintiff sought emergency treatment, reporting that she was currently in the "manic" phase of a bipolar episode (Tr. 488). She exhibited an anxious affect but was fully oriented with a normal memory and concentration (Tr. 489-490). She sought, but was denied a prescription for Ritalin (Tr. 489-490). Emergency room notes state that she drove home after being discharged (Tr. 491). Therapy notes from the following month state that her condition was improving and that she denied medication side effects (Tr. 550). She appeared anxious with a good memory and a normal thought process (Tr. 550). In July, 2010, Plaintiff sought emergency treatment for a left hand injury sustained while playing football (Tr. 480). She exhibited a normal affect, insight, and concentration (Tr. 481). She received a finger splint and a prescription for Vicodin (Tr. 482). Treating notes from the same month state that she demonstrated good eye contact and was fully oriented

with intact memory (Tr. 544).

An October, 2010 psychosocial assessment states that Plaintiff exhibited symptoms of OCD and Post Traumatic Stress Disorder ("PTSD") after "witness[ing] a cell mate die" during an incarceration for writing bad checks; the recent death of her best friend; and the 2002 death of her mother (Tr. 523). She was diagnosed with an anxiety disorder, depression, and bipolar disorder (Tr. 523). She reported that she "purg[ed]" approximately five times a week (Tr. 523). Plaintiff appeared "well oriented," but had limited short term recall (Tr. 527). She was assigned a GAF of 45 (Tr. 531). Therapy notes state that Plaintiff continued to experience an eating disorder (Tr. 471). She presented with an anxious mood, but was fully oriented with an intact memory (Tr. 471). The same month, therapist Ross L. Thayer composed a letter to Plaintiff's attorney, stating that Plaintiff had been diagnosed with anorexia and bulimia and was currently receiving therapy (Tr. 534). On October 28, 2010, Thayer completed a Mental Impairment Questionnaire, stating that Plaintiff experienced "significant [and] personal symptoms of depression, anxiety, and borderline personality disorder" (Tr. 536). He determined that Plaintiff experienced marked limitations in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 540). He found that Plaintiff's prognosis was "moderate" with a current GAF of 45 (Tr. 536). He declined to perform an assessment of Plaintiff's work-related abilities (Tr. 538-541). November, 2010 therapy notes by Thayer state that Plaintiff showed improvement but had not yet reached her therapy goals (Tr. 543).

### 2. Non-Treating Sources

In April, 2009, James P. Stevaert, Ph.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's allegations that agoraphobia kept her mostly housebound (Tr. 375-376). She reported that she had a boyfriend and one other friend,

noting that she spent her time taking care of sons and watching television (Tr. 377). Dr. Stevaert noted good posture and gait with spontaneous speech (Tr. 378). He found no evidence of malingering (Tr. 379). He assigned Plaintiff a GAF of 45 with a "poor" prognosis (Tr. 381). Dr. Stevaert found that Plaintiff's "level of emotional and medical symptoms may create a limitation in her participation in work activity" (Tr. 380).

The same month, William Schirado, Ph.D. performed a non-examining Psychiatric Review Technique based on the treating and consultative records, finding the presence of affective and anxiety disorders (Tr. 386, 389, 391). Under the "'B' Criteria," Dr. Schirado found that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 396). Dr. Schirado also completed a Mental Residual Functional Capacity Assessment finding that Plaintiff experienced marked difficulty carrying out detailed instructions and moderate difficulty maintaining attention for extended periods, working in coordination with others without distraction, completing a normal workweek without psychologically based interruptions, accepting criticism, or responding appropriately to workplace changes (Tr. 382-383). He found Plaintiff "partially credible," finding that she was capable of simple routine repetitive tasks but "no work with [the] public" (Tr. 384).

The following month, Richard C. Gause, M.D. performed a consultative physical examination of Plaintiff, noting reports of back and neck pain, a left rotator cuff tear, and asthma (Tr. 400). She exhibited a reduced range of shoulder motion and reduced grip strength on the left (Tr. 401). The same month, Mary Van Fleteren completed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 50 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 405). Fleteren found the absence of postural, visual,

or communicative limitations but found that Plaintiff was limited to frequent (as opposed to *constant*) overhead reaching and should avoid concentrated exposure to "fumes, odors, dust, gases, [and] poor ventilation" (Tr. 406-408). Fleteren found Plaintiff's claims of chronic pain "minimally credible" (Tr. 409).

### C. Vocational Expert Testimony

VE Lisa Cox classified Plaintiff's past relevant work as an automobiles sales person at Specific Vocational Preparation ("SVP") level 6,[5] at the light exertional level;[6] office clerk, SVP 3/light; accounting clerk, SVP 5/sedentary; counter worker, SVP 2/medium; mailer, SVP 3/light; and cashier, SVP 2/light (Tr. 56). The ALJ then posed the following set of hypothetical restrictions, taking into account Plaintiff's age, education, and work experience:

> [T]he individual is limited to light work . . . could occasionally carry 20 pounds, frequently carry 10 pounds; stand and/or walk at least six hours of an eight-hour workday; and sit for six hours out of an eight hour workday; let's say the individual needed to avoid work [inaudible] and needed to avoid concentrated exposure to such things as gases or fumes; is further limited to simple, repetitive tasks and having no other than incidental contact with the public, I assume contact with the public to mean contact a maid might have, work in a hotel/motel room, may bump into the people staying in a hotel and

---

[5] SVP measures the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C, http://www.occupationalinfo.org/appendxc1.html#II (last visited on November 18, 2013). Pursuant to 20 C.F.R. 404.1568, "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. SSR 00-04p.

[6] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[inaudible] basis. Could such an individual do any kind of work as the claimant has done in the past (Tr. 56-57).

Based on the above restrictions, VE found that the individual would be unable to perform any past work, but could perform the light, unskilled, work of a bench assembler (24,920 positions in the State of Michigan) and bakery worker (24,920) (Tr. 57). The VE testified that if Plaintiff's claim that she was unable to "complete an eight-hour day five days a week on a regular, consistent basis" were credited, no competitive work would be available (Tr. 57).

### D.  The ALJ's Decision

Citing the medical transcript, the ALJ found that Plaintiff experienced the severe impairments of "status post left rotator cuff tear, cervical strain, asthma, bipolar disorder, panic disorder with agoraphobia, and eating disorder" but that none of the impairments met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 24). He found that Plaintiff experienced moderate restriction in activities of daily living, social functioning, and concentration, persistence or pace (Tr. 25). He determined that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> [C]laimant is able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 6 hours in an 8-hour workday, and sit at least 6 hours in an 8-hour workday, all with normal breaks. The claimant should avoid work above shoulder level, (to avoid putting strain on her neck or left shoulder), and she should avoid concentrated exposure to such things as dust or fumes. Additionally, the claimant is limited to simple, repetitive tasks and is able to have no more than incidental contact with the general public (Tr. 26).

Citing the VE's findings, the ALJ found that Plaintiff could not perform any past relevant work but could work as a bench assembler or bakery worker (Tr. 31-32).

The ALJ concluded that Plaintiff "exaggerate[d] at least some of her symptoms" (Tr. 29). He noted that although Plaintiff alleged significant limitations as a result of a rotator cuff tear, she declined to undergo surgery (Tr. 29). He found that Plaintiff's alleged limitations in daily living could not "be objectively verified with any reasonable degree of certainty" (Tr. 29). He also noted that Plaintiff's claims were undermined by "relatively weak medical evidence" (Tr. 30). The ALJ observed that Plaintiff's psychological conditions, as described by her father, did not prevent her from caring for her school age child, cooking, and leaving the house when required (Tr. 30). He noted that she was able to handle her own finances and perform self care tasks (Tr. 30). The ALJ rejected Dr. Steyaert's opinion of Plaintiff's abilities, citing October, 2010 treating records showing that her behavior was "appropriate," with a normal thought content and memory (Tr. 31).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Findings by Ross Thayer

Plaintiff argues first that the ALJ erred by rejecting Thayer's opinion solely on the basis that the therapist was a non-treating source. *Plaintiff's Brief* at 6-8, *Docket #11.* Plaintiff contends that the ALJ was required to provide reasons for rejecting the therapist's findings "beyond the mere fact" that he was not "an acceptable medical source. *Id.* at 8.

Opinions from medical sources such as nurse practitioners, therapists, and licensed

clinical social workers are not "acceptable medical sources." 20 C.F.R. § 416.913. While these opinions must be considered "on key issues such as impairment severity and functional effects, along with other relevant evidence in the file," an ALJ is not required to accord them controlling weight or even discuss the findings in the administrative decision. SSR 06–03p, 2006 WL 2329939, *6 (August 6, 2006); *See also Kornecky v. Commissioner of Social Security,* 2006 WL 305648, *8–9 (6th Cir. February 9, 2006)(citing *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each ... opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party'").

Plaintiff's current argument fails for multiple reasons. First, she is mistaken that SSR 06-3p mandates that the ALJ articulate the weight allotted a non-treating source. Instead, the Ruling states that "the adjudicator *generally* should explain the weight given to opinions from [other medical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . ." SSR 06–03p at *6. Second, Plaintiff's claim that the ALJ rejected Thayer's October, 2010 opinion simply because the therapist was not a treating source (Tr. 31) amounts to a misstatement of the record. The ALJ's finding that "Mr. Thayer is not a physician or an acceptable medical source" is preceded by a discussion of Thayer's October, 2010 therapy records indicating that Plaintiff exhibited "some problems" "when seen on October 15, 2010" but that "improvements were noted with progress made" as of November 4, 2010 (Tr. 31). As such, the ALJ provided substantive reasons for rejecting Thayer's opinion, aside from noting that the therapist was not an "acceptable treating source." Consistent with the requirements of SSR 06-3p, the ALJ articulated reasons

sufficient for this Court to follow his reasoning.

### B. The Hypothetical Question

Plaintiff contends that the ALJ erred in stating that Dr. Schirado's non-examining conclusions were consistent with the RFC in the administrative decision. *Plaintiff's Brief* at 8-10 (Tr. 31). She notes that while Dr. Schirado limited her to jobs with "no work with the public" (Tr. 384), the hypothetical question to the VE allowed for "incidental contact with the public" (Tr. 26, 56-57). *Plaintiff's Brief* at 8-10. Plaintiff argues, in effect, that the failure to account for her full degree of limitation in the hypothetical question invalidates the vocational testimony that she could perform the work of a bench assembler or bakery worker. *Id.*

Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.,* 368 F.3d 629, 632 (6th Cir.2004).

However, Plaintiff has failed to show how Dr. Schirado's finding of "no work with the public" materially differs from the limitation of only "incidental contact with the public" as found in the hypothetical question and RFC. A plain reading of Dr. Schirado's findings, (indicating that Plaintiff's job duties should not include interaction with the public) is consistent with the hypothetical question and RFC which state similarly that Plaintiff's job duties would not involve interacting with the public but could include *incidental* contact with the public in a manner unrelated to the job itself. In explaining the concept of "incidental

contact" to the VE, the ALJ used the example of a chamber maid, who in the course of her work, would be expected to encounter a member of the public on occasion, but whose work duties would involve "no work with the public" (Tr. 56-57). Plaintiff has not shown how using Dr. Schirado's "no work with the public" instead of "incidental contact with the public" would have changed the VE's job findings. Plaintiff does not dispute that the ALJ's finding that the hypothetical individual could perform the work of either a bench assembler or bakery worker appears to comport with Dr. Schirado's "no work with the public" finding. Notably, Plaintiff does not present evidence or even argue that either of these positions require even incidental contact with the public.

Plaintiff also argues that the hypothetical question to the VE ought to have contained all of Dr. Schirado's individual findings found in the Mental Residual Functional Capacity Assessment such as marked difficulties carrying out detailed instructions and moderate difficulty maintaining attention for extended periods and working in coordination with others without distraction. *Plaintiff's Brief* at 9-10 (citing Tr. 382-383). This argument is not well taken. First, Plaintiff's position that the hypothetical question must contain a verbatim recitation of the claimant's discrete limitations has been rejected by the Sixth Circuit. *See Webb, supra*. Further, as stated in Program Operation Manual System ("POMS") DI 24510.060(B)(2)(a)), the discrete limitations found in the Section I of the Assessment (Tr. 382-383) is "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation . . ." By itself, Section I of the non-examining evaluation "does not constitute the RFC assessment." *Id.* Thus, the ALJ did not err in citing only the conclusion (Section III) of the Assessment, which stated Plaintiff's residual functional capacity after all of the limitations in Section I. had been taken into account. *Id.*

In a separate argument, Plaintiff also contends that  the hypothetical limitations of

"simple, repetitive tasks," as found by Dr. Schirado, were insufficient to account for her moderate limitations in concentration, persistence, and pace ("CPP"). She relies on *Ealy v. Commissioner,* 594 F.3d 504, 516 (6th Cir. 2010)*,* in which the Court found that the hypothetical limitations of "simple repetitive tasks" were insufficient to account for the claimant's moderate deficiencies in CPP. However, *Ealy* does not hold that the terms "simple, repetitive," "routine" or similar modifiers are intrinsically inadequate to address moderate CPP deficiencies. Rather, the *Ealy* Court determined that the hypothetical limitations of "simple, repetitive," drawn from a non-examining medical source conclusion, impermissibly truncated the same source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" *Id.,* 594 F.3d at 516. The position that "simple and repetitive" or synonymous terms are *always* insufficient to address moderate CPP deficiencies (even where the record does not support more stringent limitations) reflects an erroneous reading of *Ealy.* To the contrary, the evidence of record and the ALJ's opinion must be considered in their entirety in determining whether the hypothetical limitations adequately describe the claimant's limitations. *Smith, supra*; *see also Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations)(citing *Hess v. Comm'r of Soc. Sec.,* No. 07–13138, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008)).

In this case, the ALJ did not err in omitting greater limitations than "simple, repetitive tasks" from the hypothetical question (Tr. 56-57). My own review of the transcript supports the ALJ's finding that Plaintiff grossly exaggerated both her physical and mental symptoms (Tr. 29-30). For example, at an October, 2010 intake exam, Plaintiff reported "purging"

approximately five times a week, but two weeks later, testified at the administrative hearing that she purged four times every day (Tr. 48). Although Plaintiff testified that she was unable to attend her son's school events, touch incoming mail, or perform grocery shopping as a result of agoraphobia and OCD (45-49), March, 2008 emergency room notes state that she sustained injuries that month while riding a mechanical bull (Tr. 321, 337). At a minimum, evidence that Plaintiff was capable of riding a mechanical bull supports the inference that she was able to leave the house for events other than doctor's appointments and handle objects touched by others. Her testimony that she was unable to perform any lifting with her left arm (Tr. 54) stands at odds with July, 2010 emergency room records stating that she sustained an injury *while playing football* (Tr. 480). It is worth mentioning that Plaintiff's ability to participate in football games also undermines her claims that she was unable to leave the house, feared touching unfamiliar objects, and was unable to tolerate significant interaction with others.

Further, a review of Plaintiff's multiple emergency room visits shows that she consistently presented with an appropriate affect, unimpaired memory, and did not exhibit symptoms of agoraphobia (Tr. 331, 481, 498). Significantly, the only emergency room visit in which Plaintiff exhibited an "anxious" affect was when she was attempting to obtain psychotropic drugs (Tr. 489-490). Despite her "anxious" affect on that occasion, Plaintiff exhibited a normal memory and was able to drive herself home upon discharge (Tr. 491). Because substantial evidence amply supports the ALJ's choice of hypothetical limitations, a remand for further fact-finding is not warranted.

In closing, I note that while the record supports a certain degree of psychological limitation, the conclusion that Plaintiff is capable of a significant range of unskilled work is generously supported by the record. The ALJ's discussion of the medical evidence of record

was well developed. Based on a review of this record, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                s/ R. Steven Whalen
                                                R. STEVEN WHALEN
                                                UNITED STATES MAGISTRATE JUDGE

Dated: December 2, 2013

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 2, 2013, electronically and/or by U.S. mail.

                                                s/Carolyn M. Ciesla for Michael Williams
                                                Case Manager to the
                                                Honorable R. Steven Whalen